THE SANDWICH MANUFACTURING COMPANY, PLAINTIFF IN ERROR, V. GEORGE E. FEARY AND RUFUS B. FEARY, DEFENDANTS IN ERROR.

1. **The evidence** examined, and *Held*, Not sufficient to sustain the verdict.

2. **A verdict** so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through mistake, or some means not apparent in the record, will be set aside and a new trial awarded.

ERROR to the district court for Seward county. Tried below before NORVAL, J.

*Leese Brothers* and *R. S. Norval*, for plaintiff in error.

*D. C. McKillip* and *R. P. Anderson*, for defendants in error.

COBB, J.

This action was commenced in the district court of Seward county, by the plaintiff against the defendants, for the agreed price of two Sandwich Reliance Harvesters and

Appleby Binders, which it alleged had been ordered of it by the defendants to be paid for when the said machines had been tested and found to do good work, and which it also alleged had been delivered, and that the plaintiff had performed all of the conditions of the said order, etc. I copy the answer of the defendants at length.

"First defense: They admit the execution and delivery of the order set. forth in the petition, and deny each and every other allegation in petition.

"Second defense : Said order in petition referred to was given upon the therein expressed condition, and it was by its terms agreed and understood between the parties that the purchase of said harvesters and binders should not be considered absolute, and that the sum of $480 should in nowise be due and payable until said machines had been fully tested and found to do good work. That the machines have by defendants been fully and faithfully tried and tested by actual trial in the field, and that said machines have wholly failed to work or to serve for the purpose of cutting and harvesting grain; and that these defendants have been wholly unable to cause said machines to work, or to use or operate the same for the purpose aforesaid, by reason of which the said machines are wholly worthless, and of no value whatever to the defendants.

"Third defense: On the 25th of June, 1883, as an express condition of the sale of said machines, and in consideration of giving said written order, and as a part of the same agreement and transaction, plaintiff made, executed, and delivered to defendants, its certain written warranty of said machines and binders. *Said written warranty is attached hereto, marked exhibit " A," and made a part of this answer.*

"That by the terms of said warranty, plaintiff fully warranted each of said machines to be well made, of good material, and durable, with proper care, and to be capable of cutting from twelve to eighteen acres per day ; and if

upon starting said machines they should in any way prove defective, or fail to work, said plaintiff agrees, upon notice of said failure, to put said machines in order, and to replace any defective part, and that if then the said machines could not be made to work, the same shall be returned by the purchaser, free of charge, to the place where received, and the payment of money or notes refunded, thereby ending all further responsibility on the part of either party.

"The said machines are not well made nor of good material, and are not durable, and are not capable of cutting from twelve to eighteen acres per day; and after having been fully and faithfully tested and tried by these defendants, proved defective, and wholly failed to work or to serve for the purpose of cutting and harvesting grain, of which failure and defects defendants duly notified and advised the plaintiffs. Defendants, according to the written warranty, returned said machines to plaintiff, and have fully performed all their duties under the warranty. Plaintiff failed, neglected, and refused, although often requested, to put said machines in order, or to refund the payment of the said sum of $480, or to perform any of their duties under the warranty."

## "EXHIBIT "A," MADE PART OF ANSWER.

### WARRANTY TO BE GIVEN TO PURCHASER.

"The Sandwich Harvester machines are warranted to be made of good material, and durable, with proper care. The reaper and mower is warranted to be capable of cutting an acre of grain or grass per hour with one team. The Sandwich harvester and binder is warranted capable of cutting and binding, in a workmanlike manner, from twelve to eighteen acres per day, with sufficient team. *If upon starting the machine it should in any way prove defective, or fail to work, the purchaser shall give prompt written notice to the agent from whom he purchased it, and allow sufficient time for a person to be sent to put it in order, and the defective*

*part, if any, replaced.   (The purchaser rendering necessary and friendly assistance.)   If then it cannot be made to work,* the machine shall be returned by the purchaser free of charge to the place where received, and the payment of money or notes will be refunded, ending all further responsibility on the part of either.   Continued possession of the machine, or failure to give notice as above shall be deemed conclusive evidence that the machine fills the warranty.

" SANDWICH M'F'G CO.

" *Sandwich, Ill.*"

To this answer there was a reply by the plaintiff denying the facts therein stated, except as to the giving of the warranty therein set out, which it admitted.

There was a trial to a jury, with a verdict and judgment for the defendants.   The plaintiff brings the cause to this court on error.   In the petition the following errors are assigned :

" 1.   The verdict of the jury is not sustained by the evidence.

" 2.   The verdict of the jury is contrary to law.

" 3.   The court erred in overruling the motion for a new trial.

" 4.   The court erred in allowing the defendant, George E. Feary, to testify as to what he did, over the objection of the plaintiff.

" 5.   The court erred in sustaining the objections of the defendants and excluding the testimony of the defendants when asked the following question : Do you know that the machine is not capable of doing good work just as the warranty says?

" 6.   The court erred in sustaining the objection of the defendants and excluding from the jury the offer of plaintiff to prove that the machine would in all respects comply with the conditions of the contract if the defendants had complied with their part of the contract.

"7. The court erred in excluding from the jury the statements made by the defendants to the witness, G. Babson, Jr., on page 97."

It is not deemed necessary to take up or discuss these assignments in detail, in order to reach what I think to be the controlling point in the case. An examination of the pleadings and evidence leaves no doubt of the purchase by the defendants from the plaintiff of two Sandwich harvester and binder machines for the sum of four hundred and eighty dollars for the two; that they were sold and delivered to and received by the defendants upon an express written warranty, and were promptly returned by them upon the ground that they did not, upon trial, comply with the terms of the warranty, and that the agent of the plaintiff refused to receive the machines, when so returned, on the ground that the terms and conditions of the warranty had not been complied with on the part of the defendants, in respect to giving the notice therein provided for, and allowing sufficient time for a person to be sent to put the machine in order and replace the alleged defective part, etc.

There is some conflict in the evidence bearing upon the above points of the case, but as the jury found for the defendants, their evidence, where there is a conflict between it and that of the plaintiff, must be deemed to be true, and form the basis of our consideration.

It appears from the testimony of George E. Feary, one of the defendants, and as to this there is no conflict, that on the 7th day of July he took one of the machines to his place. It appears that at or about the same time, the other machine was also taken to the farm of the other defendant. This was Saturday. On Monday morning, the 9th day of July, pursuant to an agreement between witness and plaintiff, two men, or, as witness calls them, "boys," Cummins and Neihardt, came to witness's place to assist him in setting up and starting the machine. I

quote from his testimony: " In the morning I opened the box and commenced to set the machine up, and after the boys came we went to work. There were three of us to work on it till noon. I got my hired man to assist. We were in the field by half-past 3 or 4 o'clock, and all of us were present when the machine was tested, myself, my hired man, young Cummins, and Dan. Neihardt, and we put the machine in a piece of barley of 15 acres, and went three times around it. We were from half-past three until very near sundown trying that machine. We would go a little ways and try to adjust it, and go a little ways again, and adjust reel and butter board, and failed to make it work."

\*       \*       \*       \*       \*

Q. Tell, as near as you can, wherein the machine seemed to fail to work?

A. In the first place, it did not elevate it well. The grain came up endways. In the second place, this butt board, as they call it, they could not adjust it so it put the grain to the binder. It would run up between the butt board and the grain reel. It did not seem to get the grain to its place.

Q. State what kind of work the machine did there?

A. If you allow me to judge, it did very poor work.

Q. In what respect?

A. It did not bind very well. Most or quite a number of bundles run out between the butt board and the grain reel and did not catch it at all.

Q. By a juror. Was the barley very short?

A. In some places it was pretty tolerable short, and in some places it was not. It was more than 18 inches high, the shortest of it.

\*       \*       \*       \*       \*

" Mr. Cummins and Neihardt claimed to me that the barley was too green was the reason why it was not elevating it well. They insisted on coming back and trying it

again, and I told them I did not think it was worth while, if they claimed they could not adjust the machine and make it do good work, and I told them if it did not do good work I did not want the machine, that I could not buy a machine and pay that price for it if it failed to work. They claimed to me that they wanted to come back by Thursday morning, as they thought by that time the grain would be ripe enough, and I finally gave them the privilege to come back and try it Thursday morning. I did tell them that."

Q. Did you tell them you did think it would not work?

A. I did tell them, this butt board I did not think could be made to do good work, but I did consent for them to come back if they wanted to.

\*　　　\*　　　\*　　　\*　　　\*

Q. Did you send any word to Mr. Babson by these men?

A. I did, verbally.

\*　　　\*　　　\*　　　\*　　　\*

Q. I will ask if you tried to work this machine after Monday?

A. We did.

Q. When?

A. On Wednesday.

Q. State to the jury what you did then?

A. We tried cutting grain.

Q. What success did you have?

A. No better than we had on Monday. We went twice round the same field on Wednesday, myself and the hired man.

Q. How long did you work at it?

A. We hitched up in the morning and I think we worked at it until about 11 o'clock.

Q. And it did no good?

A. It did not do any good.

Q. State how it worked in cutting grain, how it cut it, and how it worked, as near as you can.

A. As far as cutting is concerned, it cut it off, but it would not elevate it and bind it. It would come up endways and go right out between the butt board and binder.

Q. What portion of the grain would be put off in that condition?

A. I don't know, there was considerable of it. I do not know as I could say correctly just how much did go to waste, but there was a good deal of grain would go to waste.

Q. That was on Tuesday, the 10th, was it?

A. That was on Wednesday.

\*      \*      \*      \*      \*

Q. I will ask you whether or not you came to Seward on that Wednesday?

A. I did.

Q. What time in the day did you come?

A. I judge it was about 6 o'clock.

Q. What did you come to town for?

A. I came to see Mr. Babson.

Q. Did you see him?

A. I did.

Q. State to the jury what took place between you and Mr. Babson.

A. I went over to Mr. Babson's place of business and he was not there, and I went up to his house and called for him and he came out. I told him them machines failed to do good work, and I asked him if the boys had told him on Monday evening about the work of the machine, and he said they did. I says, Mr. Babson, I do not want the machine unless it does good work and the boys started it, and it would not work and I consented to give it another trial Thursday morning, and I asked if they were going to come and he says, "I will be there bright and early Thursday morning and bring men." I believe that was all that was said at that time.

\* \* · \* \* \*

Q. You have heard the testimony of Mr. Reynolds in regard to the conversation at Staplehurst.

A. Yes, sir.

Q. State to the jury briefly what took place between you and Mr. Reynolds at Staplehurst.

A. They came to Staplehurst along about four o'clock in the evening, it might have been a little later than that, it might have been half-past four, and Mr. Reynolds wanted to know if I would not go back with him and test the machines and give him another trial, but I refused to go in the first place and told him that my grain was getting ripe and was wasting and that I would have to do something to get it saved. Mr. Reynolds claimed to me that he would be responsible for my time, and if the grain wasted he would be responsible for it, and I told him like this, I considered him the same as all these machine agents, his responsibility did not amount to anything. That is what I told him, that I didn't think he was worth half the crop there was on my place, and I would not go back with him on those terms.

Q. You say that the understanding with the agent, Babson, was he would be there or have a man there with him on Thursday morning bright and early. How long did you wait for him to come on Thursday?

A. We waited there with dinner until one o'clock, we had dinner prepared there for these men if they came, and it was one o'clock when we set down to the table to eat our dinner. After we ate our dinner we went to Staplehurst. It was half-past one or two o'clock when we started.

Q. Did you have your hands there?

A. Yes, sir, I had men there ready to shock, provided we cut any.

\* \* \* \* \*

Q. I will ask you what you have done with the machines?

A.   I delivered them.

Q.   Where, at Mr. Babson's, or at his place in this town, according to the written agreement?

A.   Yes, sir.

Q.   When did you do it?

A.   I delivered the first on the 13th day of July.

Q.   That would be on what day?

A.   That would be on Friday.

Q.   That was the machine that was taken to your farm, was it?

A.   No, sir, that was the machine that was at my brother's.

Q.   You delivered that on the 13th of July?

A.   I delivered that one on the 13th day of July.

Q.   Did you deliver it personally or by some one else?

A.   Personally.

Q.   To whom did you deliver it?

A.   To Mr. Babson.

Q.   In person?

A.   Yes, sir.

Q.   What was said and done at that time, when you delivered the machine to Mr. Babson?

A.   In the first place he refused to receive the machine and I drove up there and unloaded in his yard, and after I had unloaded the machine, he wanted to exchange a Walter A. Woods in preference to it or he wanted me to take a Walter A. Woods machine and try it.

Q.   In exchange for the other one?

A.   Yes, sir.

Q.   Do you know where the machines are?

A.   The last time I was along there I saw them lying there by Mr. Babson's, a day or two ago.   I suppose they are the same machines, but I would not swear to that. They are the same make, though, I think."

There was uncontradicted evidence on the part of the plaintiff that the first notice received by the agent of the

plaintiff who sold the machines, that upon starting the machines, or either of them, in grain proper to be harvested, they had proved defective or failed to work, was late in the evening of Wednesday. That at that time James, an expert in the use and handling of reaping machines, in the employment of the plaintiff in testing and rectifying machines sold by plaintiff, was at, or in the neighborhood of, Ulysses, a neighboring town ; that Babson, the agent, immediately upon the close of the interview between him and defendant, G. E. Feary, as testified to by him, went to the depot to telegraph to Ulysses for the purpose of bringing said James, the expert, to Seward for the purpose of putting the machines in controversy in order, but was unable to establish telegraphic communication with that place. That the agent thereupon engaged a team for four o'clock the following morning to drive to Ulysses with the object of procuring the said expert for the purpose aforesaid. That Babson was at the stable very early in the morning before the stable keeper was up. That as soon as he could get the team he started and drove to Ulysses, arriving there about half-past six o'clock Thursday morning. That he then found that Mr. James was at the farm of Mr. Cook, about ten miles west of Ulysses. That Babson then procured a fresh team with a driver and sent the same to Mr. Cook's for James, and had him brought to Ulysses by about 11 o'clock A.M. That at this time Babson became sick of cholera morbus, and, being unable to travel, procured Mr. Reynolds, a machine man of Ulysses, to accompany Mr. James to the farm of defendant for the purpose of testing and rectifying the said machine. That after partaking of an early and hasty dinner, as early as 12 o'clock M., they started and arrived at the house of the defendant, G. E. Feary, according to the plaintiff's witnesses, between 12 M. and 1 P.M., but according to the testimony of defendant it could not have been so early. But in my view the difference is not material. Upon arriving at the house of

defendant, James and Reynolds were informed that G. E. Feary had gone to Staplehurst for the purpose of hauling out some machinery. That James and Reynolds then followed him to Staplehurst, arriving there not to exceed five minutes behind him. They found him at the place where reaping machines were kept for sale, but before he had made any arrangements for another machine they made known to him the purpose for which they had come to his farm and requested him to return with them to his farm and allow them to test and put the machine in order, and declared their ability to make it do good work. That this he refused to do, but forbade their going on to his place for any other purpose than to take the machine away.

It will be seen by reference to the written warranty set up in the answer, a copy of which is set out at length, as an exhibit by the defendants, that it was a condition of said warranty that, "If upon starting the machine it should in any way prove defective or fail to work, the purchaser shall give prompt written notice to the agent from whom he purchased it, and allow sufficient time for a person to be sent to put it in order, and the defective part, if any, replaced (the purchaser rendering necessary and friendly assistance)." Now, it is not contended, nor can it be, that the written notice above contemplated was given so as to avail the defendants in the case, although it was drawn out upon the cross-examination of one of the defendants when on the stand as a witness, that some kind of a notice was mailed to plaintiff's agent within a few minutes of the time when plaintiff's experts applied to the defendant at Staplehurst for permission to test and put in order the machine claimed to have been started and found defective. But defendants contend that plaintiff, through its agent, waived the giving of written notice. This I think it did, but when, and how? Upon the answer to these questions I think the case turns. Was it waived by sendings Cummins and Niehardt to assist defendant to set up

the machine? Certainly the plaintiff was under no obligation to assist the defendants in setting up or testing the machines, until they were found or claimed by the defendants to be defective, and that it did so can only be attributed to a desire on its part, or that of its agent, to cultivate the good-will and friendship of its customers. These men, or boys, as the defendants call them, were not experts nor claimed to be such, yet being employed about the warehouse where the machines were kept might be reasonably supposed to be more handy in putting the different parts of a machine together than the majority of the purchasers of such machines. When they were sent to the farm of defendant the machine in question was believed by all parties concerned to be perfect of its kind ; it was contemplated that upon its trial it might prove defective, or even if not materially defective the purchaser might claim that it was. Could the act of sending them to assist in putting the machine together be construed into a waiver of notice of any defect in it which might thereafter be developed in fact or claimed by the purchaser? I think not. It will not be contended that these men were agents of the plaintiff upon whom notice to it could have been served, or whose knowledge of any fact could be brought home to it as its knowledge. And yet, having been sent by the agent of the plaintiff to assist the defendants to set up the machine, had they, by their negligence or want of skill, broken or injured the machine, the plaintiff, upon well-known principles of law, would have been liable for the injury occasioned thereby.

There is nothing in the evidence to the effect that the defendants notified Babson, the plaintiff's agent, through Cummins and Neihardt, or either of them, that upon starting the machine it had proved defective, or failed to work. It is evident from the testimony of the defendant, G. E. Feary, that he did not consider the trial of the machine in the presence of Cummins and Neihardt as conclu-

sive or satisfactory, because in his testimony he stated that
on the Wednesday following he again tried cutting grain
with the machine. That he hitched up in the morning
and worked with the machine until eleven o'clock. About
six o'clock in the evening of that day defendant went to
Seward and verbally notified Babson that the machine
failed to do good work. Up to this point of time, there
can be no doubt, as I view the law, that the plaintiff was
entitled to written notice. At this time verbal notice was
given to the agent. Plaintiff had the option to stand upon
its right under the terms of the warranty to notice in writ-
ing, or to waive it. Counsel for defendants in the brief
claim that plaintiff waived the written notice by acting on
this verbal one. In this I agree with them. But when
and how? On Thursday, July 12th, by sending a person
to put the machine in order. This was the only act of
plaintiff's agent in reference to the machines, between the
date of their delivery to the defendants and their return,
and it will be claimed by no one that between this waiver
and the return of the machines by the defendants there
was allowed sufficient time to put the machine in order and
replace any defective part, or that the defendants offered
to render friendly assistance for such purpose. But on the
contrary, it is stated by the principal defendant in his tes-
timony that upon the completion of the act on the part of
defendant, which as we have seen constituted a waiver of
the written notice, he forbade the person sent by plaintiff
to go upon his premises, except for the purpose of taking
the machine away.

But it must be admitted that it is the logic of defend-
ants' contention, though not so claimed in the brief, that
the plaintiff waived the written notice on the evening of
Wednesday, July 11th, by the promise of its agent to "be
on hand bright and early Thursday morning" to put the
machine in order. I know of no case, and certainly none
is cited by counsel, which holds that a promise to act upon

a verbal notice amounts to a waiver of a written one, yet I think it would in a case where such promise is made in bad faith. But there is no evidence of bad faith here. On the contrary, the agent used extraordinary exertion and diligence to procure a competent person to put the machine in proper order.

The language of the contract of warranty is, the defendants should " allow sufficient time for a person to be sent to put it in order," etc., after the giving the notice. The word *sufficient*, as here used, means reasonable, a reasonable time under the circumstances, which must have been within the contemplation of both parties when entering into the contract. While it must have been within the contemplation of the parties that the plaintiff would have one or more persons competent to put the machine in order in their employ, or accessible to them somewhere within the radius of the operations of the Seward agency and business, it cannot reasonably be supposed to have been within their contemplation that it would have in its employ an expert machinist to every machine, waiting the result of its trial by the purchaser. So that, in my opinion, this sufficient time must be construed to mean a reasonably sufficient time to call in from the country, wherever he might reasonably be expected to be engaged in similar work, the person or one of the persons employed by the plaintiff company for such service, and send him to the farm of the defendant. Now then, upon the theory which we are now considering, and taking the view of the case most favorable to the defendants possible upon the evidence, which it must be admitted it is our duty to do, were the jury warranted in finding that later than half-past one or two o'clock of the day following that on which the verbal notice was given at about six o'clock in the evening, was more than a sufficient or reasonable time to give for the purpose contemplated? I think not. In coming to this conclusion I by no means forget that the jury is the judge

of what is reasonable or necessary upon the facts in every case, nor do I forget what has been so often declared here, that a verdict will be sustained unless clearly wrong. So that in coming to the conclusion that there must be a new trial in this case, I do so upon the ground that the verdict is clearly wrong, and must have been found through mistake or some means not apparent in the record.

The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

THE other judges concur.